UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| ERICA HUGHES,<br><br>             Plaintiff,<br><br>     vs.<br><br>KILOLO KIJAKAZI, ACTING<br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>             Defendant. | 5:22-CV-05070-DW<br><br><br>ORDER |

Erica Hughes filed a complaint appealing the final decision of Kilolo Kijakazi, the acting Commissioner of the Social Security Administration ["SSA"], denying disability insurance benefits.  (Doc. 1).  Defendant denies claimant is entitled to benefits.  (Doc. 5).  The court issued a briefing schedule (Doc. 8) requiring the parties to file a joint statement of materials facts ["JSMF"] (Doc. 11).  The parties' JSMF is incorporated by reference.  Further recitation of the salient facts is incorporated in the discussion section of this order.

The Court has reviewed the parties' briefs and the administrative record ["AR"], including the transcripts and medical evidence.  For the reasons stated below, the claimant's motion to reverse the decision of the Commissioner (Doc. 12) is affirmed and the Commissioner's motion to remand to the SSA (Doc. 13) is denied.

On April 22, 2014, Hughes filed an application for Social Security disability benefits.  (AR 194-200[1]).  The claim was initially denied in December 2016.  Id. at pp. 12-23.  Hughes sought review from the Appeals Council, who denied the request for review, making the decision of the ALJ final.  Id. at pp. 1-4.  In March 2019, this Court reversed the ALJ's decision and found the ALJ erroneously discredited Dr. Lord and Dr. Huot's opinions.  Hughes v. Berryhill, 5:17-CV-05085, Doc. 26; AR 1515-1529.  The Court reversed the ALJ's decision and held "there does not appear to be any dispute that Ms. Hughes suffers from CRPS [complex regional pain syndrome]."  (AR 1524).

In November 2019, a second hearing was held.  (JSMF ¶ 9).  The ALJ denied Hughes' claim.  Id. ¶ 10.  In October 2020, the SSA Appeals Council reversed the ALJ's decision.  Id. ¶ 12.

On March 23, 2021, a third hearing was held.  Id. ¶ 13; AR 1463-86.  The ALJ rejected Dr. Lord, Dr. Atkin, and Dr. Huot's opinions, discounted Hughes and her sister's testimony, and denied disability.  Id. ¶ 14.  Hughes sought review from the Appeals Council, who denied the request for review, making the decision of the ALJ final.  (AR 1382-85).  It is from this decision that Hughes timely appeals.

## I.   STANDARD OF REVIEW

The issue before this court is whether the ALJ's decision that Hughes was not under a disability, as defined in the Social Security Act, from

---

[1] The court will cite to information in the administrative record as "AR ___." (Docs. 6 & 7).  Citations by the ALJ will be amended to match the AR.

September 1, 2013, through the present, is supported by substantial evidence on the record.  42 U.S.C. § 405(g); Howard v. Massanari, 255 F.3d 577, 580 (8th Cir. 2001).   "Substantial evidence is less than a preponderance [] but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted).

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by "good reason" and is based on substantial evidence.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).  A reviewing court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision."  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).

The review of a decision to deny benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision."  Reed, 399 F.3d at 920 (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).

The SSA established a sequential evaluation process for determining whether an individual is disabled and entitled to benefits under Title XVI:

**Step One:** Determine whether the applicant is presently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).  If the applicant is

3

engaged in substantial gainful activity, he is not disabled, and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are severe, i.e., whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. Id. at § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled, and the inquiry ends at this step. The regulations prescribe a procedure for analyzing mental impairments to determine whether they are severe, which includes completion of a Psychiatric Review Technique Form. Id.

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a listing in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460 (1983). If the applicant's impairment(s) are severe but do not meet or equal a Listed impairment the ALJ must proceed to step four.

**Step Four:** Determine whether the applicant can perform past relevant work. To make this determination, the ALJ considers the limiting effects of all the applicant's impairments (even those that are not severe) to determine the applicant's residual functional capacity ["RFC"]. If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this

determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. <u>Id.</u> at § 1520(f).

The plaintiff bears the burden of proof at steps one through four. <u>Barrett v. Shalala</u>, 38 F.3d 1019, 1024 (8th Cir. 1994). At step five, the burden of proof shifts to the Commissioner. <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004). "[E]ven when the burden of production shifts to the Commissioner," "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant." <u>Id.</u>

## II.   DISCUSSION

The ALJ applied the five-step test and determined that Hughes was not disabled. (AR 1392-1411).

At step one, the ALJ determined that Hughes had not engaged in substantial gainful activity since September 1, 2017, the alleged onset date of disability. <u>Id.</u> at p. 1395.

In evaluating step two, the ALJ found that Hughes suffered from these "severe impairments: CRPS involving the right wrist and hand, right shoulder labral/SLAP tear with tendinosis, anxiety disorder, and depressive disorder." <u>Id.</u> The ALJ concluded that Hughes suffered from obesity, which is a non-severe impairment. <u>Id.</u> at p. 1396. The ALJ also held that "the evidence is insufficient to establish a primary headache disorder as a medically determinable impairment[.]" <u>Id.</u>

Social Security Ruling (SSR) 03-2p states "RSDS/CRPS[2] are terms used to describe a constellation of symptoms and signs that may occur following an injury to bone or soft tissue."  SSR 03–2p, 2003 WL 22399117, at *1 (Oct. 20, 2003).  RSDS most often results from trauma to a single extremity; "the precipitating injury may be so minor that the individual does not even recall sustaining an injury."  Id.  "It is characteristic of this syndrome that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual.  When left untreated, the signs and symptoms of the disorder may worsen over time."  Id.  "RSDS/CRPS patients typically report persistent, burning, aching or searing pain that is initially localized to the site of the injury.  The involved area usually has increased sensitivity to touch."  Id. at *2.

"A diagnosis of RSDS/CRPS requires the presence of complaints of persistent, intense pain that results in impaired mobility of the affected region."  Id.  "It should be noted that conflicting evidence in the medical record is not unusual in cases of RSDS due to the transitory nature of its objective findings and the complicated diagnostic process involved."  Id. at *5. Symptoms of RSDS are transient in nature; this transient nature must not affect a finding that the condition is a medically determinable impairment.  Id. at *4.

---

[2] Reflex Sympathetic Dystrophy Syndrome (RSDS) is also known as Type 1 CRPS, which occurs after an illness or injury that didn't directly damage the nerves in the affected limb.  See Mayo Clinic, Complex regional pain syndrome (last visited July 11, 2023) https://www.mayoclinic.org/diseases-conditions/crps-complex-regional-pain-syndrome/symptoms-causes/syc-20371151.

At step three, the ALJ found that Hughes does not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in the relevant regulations, 20 C.F.R. Part 404 Subpart P, Appendix 1.  (AR 1397).

In evaluating step four, the ALJ resolved that despite Hughes' impairments she "had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) as follows:

> lift, carry, push, and pull 50 pounds occasionally and 20 pounds frequently; stand and/or walk for about six hours in an eight hour workday with normal work breaks; sit for about six hours in an eight-hour workday with normal work breaks; frequently reach overhead and in all other directions with the right upper extremity; frequently push and pull with the right upper extremity; occasionally handle, finger, and feel with the right upper extremity; continuously use the left upper extremity for all reaching, pushing, pulling, handling, fingering, and feeling; frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and avoid concentrated exposure to work hazards.  Normal work breaks are defined as breaks occurring every two hours, with two breaks lasting at least 10 minutes and one break lasting at least 30 minutes.  The claimant was able to understand, remember, and carry out simple tasks.  She was able to maintain attention, concentration, persistence, and pace for simple tasks during eight-hour workdays and 40-hour workweeks.  The claimant was also able to tolerate interactions with supervisors, coworkers, and members of the public.  Finally, the claimant was able to tolerate usual work situations and changes in routine work settings.

Id. at p. 1400.

At step five, the ALJ held that Hughes is unable to perform any past relevant work, holding "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not

7

the claimant has transferable job skills." <u>Id.</u> at pp. 1408-09.  The ALJ found that "considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed." <u>Id.</u> at p. 1409.

The ALJ concluded "claimant was not under a disability, as defined in the Social Security Act, at anytime from September 1, 2013, the amended alleged onset date, through December 31, 2017, the date last insured[.]" <u>Id.</u> at p. 1410.

Hughes brings four issues on appeal: 1) whether the ALJ erred by rejecting treating psychiatrist Dr. Lord's opinions regarding Hughes' psychological condition or Dr. Huot's opinions regarding Hughes' physical condition; 2) whether the ALJ erred by rejecting Hughes' credibility; 3) whether Hughes met or equal Listing 12.04(C)(2); and 4) whether this case should be reversed.  (Doc. 12, p. 1).

The Commissioner "moves the Court, pursuant to sentence four of 42 U.S.C. § 405(g), to enter a judgment with an order of reversal and remand of the cause to the Commissioner for further administrative proceedings."  (Doc. 13, p. 1).

**A. ALJ erred in rejecting Dr. Lord's and Dr. Huot's opinions.**

In deciding whether a claimant is disabled, the ALJ considers medical opinions along with "the rest of the relevant evidence" in the record.  20 C.F.R.

404.1527(b).[3]  Under the regulation, "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [claimant's] impairment(s), including [claimant's] symptoms, diagnosis, and prognosis, and what [claimant] can still do despite the impairment(s), and . . . physical or mental restrictions."  20 CFR § 404.1527(b).  An ALJ is not required to discuss every piece of evidence, and their failure to cite specific evidence does not mean they did not consider it.  Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000).

The SSA states if the ALJ finds "a treating source's opinion on the issue(s) of the nature and severity of [the applicant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with the other substantial evidence in [the applicant's] record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).  In advising the ALJ on how to weigh medical opinions, the SSA stated:

> unless the ALJ gives a treating source's opinion controlling weight the ALJ considers all of the following factors in deciding the weight to give to any medical opinion: (1) examining relationship, (2) treating relationship; (3) supportability of the opinion; (4) consistency; (5) specialization; and (6) any factors [the applicant] or others bring to the ALJ's attention.

Id. at § 404.1527(d) (modified); see Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).  The ALJ must provide a good reasons for the weight afforded to a treating physician's evaluation.  Id. at §§ 404.1527(d)(2), 416.927(d)(2).

---

[3] 20 C.F.R. § 404.1527 governs the evaluation of medical evidence for all claims filed before March 27, 2017, including Hughes.

"A treating physician's opinion, however, 'does not automatically control or obviate the need to evaluate the record as a whole.' " Nowling v. Colvin, 813 F.3d 1110, 1122-23 (8th Cir. 2016) (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)).  If the opinion of the treating physician is inconsistent, or if other medical evaluations are "supported by better or more thorough medical evidence," the ALJ may be entitled to discount or disregard a treating physician's opinion.  Id. at p. 1123; House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007); Wagner, 499 F.3d at 853–854; Guilliams, 393 F.3d at 803.  "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant."  Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1)).

When opinions of consulting physicians' conflict with opinions of treating physicians, the ALJ must resolve the conflict.  Wagner, 499 F.3d at 849.  Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record, especially when they are contradicted by the treating physician's medical opinion.  Id.  However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's RFC determination, such a conclusion may be supported by substantial evidence.  Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004).  Also, where a nontreating physician's opinion is supported by better or more thorough medical evidence, the ALJ may credit that evaluation over a treating physician's evaluation.

10

Flynn v. Astrue, 513 F.3d 788, 793 (8th Cir. 2008) (citing Casey v. Astrue, 503 F.3d 687, 691–692 (8th Cir. 2007)).

### 1. Dr. Lord

Psychiatrist Dr. Lord treated Hughes from January 22, 2008, until February 19, 2021.  (AR 429 & 2239).  After Hughes' September 1, 2013, onset date, Dr. Lord saw her 47 times.  (JSMF ¶ 6).  Dr. Lord constitutes Hughes' treating physician, as he provides Hughes with medical treatment and has an ongoing treatment relationship with her.  20 C.F.R. §§ 404.1502 & 416.902.  Therefore, his opinion is entitled to controlling weight if it is well supported by medically acceptable diagnostic techniques and consistent with the other evidence in the AR.  See Singh, 222 F.3d at 452.  The ALJ must give good reasons for the weight afforded to his opinion.  Id.  The ALJ "afford[ed] minimal weight" to Dr. Lord's 2014 and 2016 opinions.  (AR 1405).   The court will address Dr. Lord's 2014 and 2016 statements.

### a. Dr. Lord's 2014 Opinion

In December 2014, Dr. Lord's opined that Hughes "has been told by other physicians, including myself that she is not able to work because of her chronic pain/psychiatric issues." Id. at p. 761.  The ALJ found this statement to be on an issue reserved to the Commissioner and inconsistent with Dr. Lord's mostly normal mental status examinations and his reports of improvement with medication.  (AR 392-430, 496, 744-70, 820-33, 857-63, 1859-94, 1895-2101)." Id. at 1405.

11

Dr Lord's past medical records supports his opinion that Hughes is disabled.  Regarding Hughes' psychiatric issues, in April 2013, Dr. Lord noted that Hughes "continues to make a heroic effort to work at least part time, working one or two days a week at the local medical clinic[.]"  Id. at p. 402.  In June 2014, Dr. Lord described Hughes as suffering from "significant anxiety," "anhedonia and dysphoria."  Id. at 744 & 748.  In May 2015, Dr. Lord found Hughes to have a "complicated psychiatric presentation" and "breakthrough anxiety."  Id. at pp. 769-70.  In March 2016, Dr. Lord described Hughes has "having anxiety, almost house bound syndrome."  Id. at p. 857.  In 2018, she had had "severe co-morbid anxiety, panic attacks, and akesthesia.  Id. at p. 857.  Regarding Hughes' physical health issues, the AR details Hughes' many medical issues, including CRPS.  Id. at pp. 745-47, 824-27, 859-60, 862, & 1859-71, 1872, 2018, & 2085.  Dr. Lord's opinions are consistent with his other examinations; this is not a good reason to discount Dr. Lord's 2014 opinion.

Further, while Hughes may have had periods of improvement with medication, "mental impairments can wax and wane."  Wellman v. Berryhill, 4:16–CV–04159, 2017 WL 5990116, at *19 (D.S.D. Nov. 9, 2017).  A claimant may experience periods where they are apparently healthy, while at other times they experience debilitating effects from their impairments.  Id. (citation omitted).  Read as a whole, Hughes' treatment notes indicate her symptoms waxed and waned with some short-term improvement but without substantial

long-term improvement.  Therefore, this is not a good reason to discount Dr. Lord's opinion.

The ALJ states that Dr. Lord's 2014 opinion was "on an issue reserved to the Commissioner." Id. at p. 1405.  It is true that "a treating physician's opinion as to whether a patient is disabled or unable to work is not dispositive because these are 'issues reserved to the Commissioner and are not the type of opinions which receive controlling weight.' " Vossen v. Astrue, 612 F.3d 1011, 1015 (8th Cir. 2010); see Nelson v. Sullivan, 946 F.2d 1314, 1316–17 (8th Cir. 1991) (holding that it was improper for a treating physicians to state that the claimant could not be "gainfully employed").  But it is also true that "medical opinions on how much work a claimant can do are not only allowed, but encouraged." Smallwood v. Chater, 65 F.3d 87, 89 (8th Cir. 1995) (citing 20 C.F.R. § 404.1513(b)).

In Lynde, the Doctor's opinion that Claimant was "unable to work at this time" was improperly discounted by the ALJ as "the Court finds it was proper for Dr. Mondell to offer an opinion as to Ms. Lynde's ability to work." Lynde v. Astrue, 5:10-cv-05022, 2012 WL 704316, at *4 (Mar. 4, 2012).  Here, Dr. Lord stated Hughes "has been told by other physicians, including myself that she is not able to work because of her chronic pain/psychiatric issues."  (AR 761).  Dr. Lord's statement was not a statement of whether the claimant could be "gainfully employed," but rather was similar to the statement in Lynde regarding the Claimant's ability to work, which is a proper medical opinion.

13

### b. Dr. Lord's 2016 Opinion

The ALJ's deemed Dr. Lord's July 2016 mental assessment form (AR 864-66) to be "[un]supported by a reasonable explanation." Id. at p. 1405. In that opinion, Dr. Lord deemed that Hughes had marked restrictions on her ability to understand and remember simple instructions, understand and remember complex instructions, make judgments on complex work related decisions, interact appropriately with supervisors, interact appropriately with co-workers and respond appropriately to usual work situations and to changes in a routine work setting. Id. at pp. 864-65. Dr. Lord opined that Hughes had an extreme limitation in her ability to carry out complex instructions and moderate restrictions on her ability to carry out simple instructions, make judgments on simple work related decisions, and interact appropriately with the public. Id. In support of his opinion, Dr. Lord wrote Hughes had

> [s]evere memory, concentration and focus impairment due to depression/metabolic/chronic problems – treatment resistant mood disorder complicated by chronic pain and metabolic deficiencies. Severe insomnia, panic attacks, anxiety and multiple medication side effects. Mood swings, memory problems, [word unknown], fatigue sensitivity to stress is extremely high, easily discouraged and low self-esteem. Persistent suicidal ideation under [word unreadable] long lasting, etc. Extremely emotionally isolated – difficult to do just her daily chores and has young daughter to parent – [word unknown] effects social/emotional life globally. Bipolar disorder and severe anxiety. Complex medication profile.

(JSMF 221). The ALJ found Dr. Lord's assessment to be uncredible, finding that the limitations are inconsistent with

> (1) Dr. Lord's treatment notes and the normal mental status examinations therein (AR 392-430, 496, 744-70, 820-33, 857-63, 1859-94, 1895-2101); (2) the conservative mental health treatment

14

> history and the reports of improved moods and resolved side
> effects with medication changes (AR 1872 & 1879); (3) Hughes'
> daily activities and exercise routine.

(AR 1405 (modified)).  The court will address each of the ALJ's findings.

First, the ALJ contends that Dr. Lord's prior treatment notes are inconsistent with his opinion.  Id.  Numerous treatment notes reflect that Hughes has difficulties with concentration, focus, and memory.  Id. at pp. 393, 395, 748, 751, 753, 760, & 765.  The notes also reflect that she has anxiety, depression, and suicidal ideations.  Id. at pp. 392, 396, 744, 754, 756, & 820. She had side effects from her medication which caused mood swings and insomnia.  Id. at p. 763.  Hughes' AR details her medical issues, including CRPS and severe mood disorder.  See id. at pp. 745-47, 824-27, 859-60, 862, 1859-71, 1872, 2018, & 2085.  The first claim is unsupported by the record; therefore, this is not a good reason to discount Dr. Lord's opinion.

Second, the ALJ found Dr. Lord's limitations to be inconsistent with the conservative mental health treatment history and the reports of improved moods and resolved side effects with medication changes (AR 1872 & 1879). Id. at p. 1405.  It is true that Hughes had period of waxing and waning mental health conditions.  See Nowling, 813 F.3d at 1123 ("mental impairments can wax and wane" as a claimant may experience periods where they are apparently healthy, while at other times they experience debilitating effects from their impairments).  The SSR reminds the ALJ that symptoms of RSDS are transient in nature, which must not affect a finding that the condition is a medically determinable impairment.  SSR 03–2p, 2003 WL 22399117, at *4.

15

The ALJ's decision is not supported by substantial evidence.  For example, AR 1872, which the ALJ cited to, states, in relevant part, that Hughes was "doing much better with the Rexulti than she has with previous attempts such as the Vraylar, which gave her headaches. . . .  She makes heroic effort to manage her mood as well as her chronic pain[.]"  Id. at p. 1872.  Additionally, the other citation the ALJ provided was to AR 1879, which states, in relevant part, "the Rexulti has done better than the Abilify as far as both side effects and her mood disorder. . . .  She does have periods of time where she has insomnia and other periods where she sleeps better due to mood flux.  Id. at p. 1879.  Because Hughes' improvement coincides with her being in a highly structured environment, such improvement is not indicative of not being disabled.  See Nowling, 813 F.3d at 1123.

In its prior decision, this court found that "treatment records of Dr. Lord are replete with examples of the effects of Ms. Hughes' depression and anxiety, including not leaving the house for several days, presentation with psychomotor retardation, needing family [to] come assist her with child care due to her limitations, difficulty with concentration, focus, and memory, insomnia, being anxious about taking her daughter to school, anxious about going anywhere, being avoidant, and states that Ms. Hughes is 'definitely disabled regarding her ability to function, hold and job and follow through.' "  Hughes v. Berryhill, 5:17-CV-05085, Doc. 26, pp. 13-14 (quoting JSMF ¶¶ 160-207).

Third, the ALJ found Dr. Lord's limitations to be inconsistent with the claimant's daily activities and exercise routine. (AR 1405). As discussed earlier, Hughes life must be considered in the context of her highly structured life. As held in <u>Stickler</u>, "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." <u>Stickler v. Colvin</u>, 173 F. Supp. 3d 925, 941-42 (D.S.D. 2016) (quoting <u>Hogg</u>, 45 F.3d at 278–79).

Dr. Lord's opinion is based on his multiple interactions with Hughes, as outlined in the JSMF. His opinion was similar to his March 1, 2016, opinion noting that she is overwhelmed and has "anxiety, almost housebound syndrome." (AR 857). Dr. Lord reported "she says she is anxious about taking her daughter to school, anxious about going anywhere and is avoidant." <u>Id.</u> Dr. Lord noted "this is despite heroic efforts of anti-anxiety medications and mood stabilizers for her bipolar disorder." <u>Id.</u>

The ALJ's determination to "afford minimal weight" to Dr. Lord's July 2016 mental assessment form (AR 864-66) was not supported by substantial evidence.

In this court's prior decision it rejected the ALJ's dismissal of Dr. Lord's 2016 opinion, writing "the treatment records of Dr. Lord are replete with examples of the effects of Ms. Hughes' depression and anxiety, including not leaving the house for several days, presentation with psychomotor retardation, needing family [to] come assist her with child care due to her limitations, difficulty with concentration, focus, and memory, insomnia, being anxious

about taking her daughter to school, anxious about going anywhere, [and] being avoidant." Id. at pp. 1527-28.  The Court also found Dr. Lord's statement that Hughes was "'definitely disabled regarding her ability to function, hold [a] job and follow through'" to be persuasive.  Id. at p. 1528.

Because Dr. Lord was a treating physician, his opinions are well supported by medically acceptable diagnostic technique, and consistent with the other evidence in the record, his July 2016 mental assessment form (AR 864-66) is "entitled to controlling weight."  See Singh, 222 F.3d at 452.

### 2. Dr. Huot

Dr. Michael Huot, M.D., co-director of Regional Pain Management, has seen Hughes "for several years."  (AR 867).  In this Court's prior decision, it found that Dr. Huot was Hughes' treating doctor.  Id. at p. 1525.  This court held that the ALJ's decision that Hughes' CRPS was not a severe impairment was erroneous.  Id. at p. 1524.  Dr. Huot opined that Hughes developed CRPS "in her right arm in 2002 after sustaining a fracture."  Id.  He stated her condition "continues to affect her on a daily basis."  Id.

The ALJ afforded minimal weight to Dr. Huot's July 2016 statement, "claimant's debilitating pain prevents her from being able to work a normal workday (AR 867)," citing six reasons:

> (1) it was "an issue reserved to the Commissioner;" (2) "Dr. Huot did not specify on the type, severity, frequency, or locale of the claimant's debilitating pain, and he offered no function-by-function assessment of the claimant abilities and limitations;" (3) the statement is "inconsistent with the conservative treatment history and the mostly normal physical examinations;" (4) "in December 2017, another pain management provider noted Hughes was "able to function in life with the current medications," but noted she

18

> "would be unable to function or use the right upper extremity without medications (AR 1913 & 1916); (5) Hughes "began weaning off pain medications without a significant exacerbation or worsening in pain, which conflicts with the description of the claimant's functioning without pain medications" (AR 1980, 1984, 1994, 1999, 2014, 2035, & 2051);" and (6) "the claimant's daily activities and exercise routine conflict with this statement."

Id. at p. 1406.

First, the ALJ stated that Dr. Hout's claim was on an issued reserved to Commissioner.  Id.  As previously discussed, there are some opinions that are on issues "reserved to the Commissioner and are not the type of opinions which receive controlling weight."  Vossen, 612 F.3d at 1015.  However, as previously discussed, the court in Lynde, found that the Doctor's opinion that Claimant was "unable to work at this time" was improperly discounted by the ALJ.  Lynde, 5:10-cv-05022, 2012 WL 704316.  Here, Dr. Huot's statement that Hughes has "debilitating pain [which] prevents her from being able to work a normal workday" (AR 867) is similar to the statement in Lynde regarding the Claimant's ability to work, which the court held was a proper medical opinion. Therefore, this is not a good reason to discount Dr. Huot's opinion.

Second, the ALJ stated "Dr. Huot did not specify on the type, severity, frequency, or locale of [Hughes'] debilitating pain, and he offered no function-by-function assessment of the claimant abilities and limitations."  (AR 1406).  It is true that in the July 15, 2016, letter Dr. Huot did not specify the type, severity, frequency, or locale of Hughes' pain, and he offered no function-by-function assessment of the claimant abilities and limitations.  However, the AR is full of examples of Dr. Huot providing that information in his treatment

notes.  See id. at pp. 527-28, 529-30, 552, 553-555, 560-63, 572-74, 845-46, & 894-95.  In its prior opinion this Court ruled that the ALJ's rejection of Dr. Huot's opinions due to the medical record being "absent of any clinical signs of these symptoms" was "contrary to the medical records."  Id. at pp. 1523-24. The Court noted "[c]linical objective observations regarding claimant['']s swelling, changes in skin color or texture . . . can be found at JSMF paragraphs" 22, 24, 64, 98, 101, and 110-116."[4]  Id. at p. 1523.  The Court found that "there does not appear to be any dispute that Ms. Hughes suffers from CRPS."  Id.  Because Dr. Huot specified the type, severity, frequency, and locale of Hughes' debilitating pain, and offered an assessment of the claimant abilities and limitations, the court does not find the ALJ's claim to the contrary to be a good reason to discount Dr. Huot's statement.

Third, the ALJ found the conservative treatment history and "the mostly normal physical examinations [] conflict with this statement and do not illustrate a total inability to use the right upper extremity without medications." Id. at p. 1406.  However, Hughes need not establish an inability to use her right upper extremity without medication and the record has numerous examples of Hughes physical examinations illustrating she suffers from CRPS.  For instance, Hughes' medical records show she was diagnosed with CRPS/RSDS as early as May 2002.  Id. at pp. 1080 & 1092.  On February 21, 2013, Hughes saw CNP Glanzer, who documented cramping in the right

---

[4] Citations to the prior JSMF were amended to match the current JSMF (Doc. 11).

upper extremity as well as color changes, allodynia, and swelling.  Id. at p. 578.
In December 2015, when CNP Langbehn saw Hughes, who described right
shoulder pain/burning to fingers of 4-6/10.  Id. at p. 849.  In April 2013, Dr.
Frost noted Hughes was complaining of a burning sensation and pain with
increased sensitivity to touch starting in the proximal area of the neck, down to
her fingertips.  Id. at p. 568.  On examination, Dr. Frost noted "allodynia
starting in the neck, all the way down the right arm.  Color change noted.  No
significant swelling noted.  No change in range of motion."  Id.  This court
agrees with the prior decision that the JSMF provided many examples of
Hughes' irregular physical examinations.  Id. at p. 1524.

On July 14, 2016, Dr. Huot saw Hughes for her right arm pain "due to a
history of Complex Regional Pain Syndrome, which started with a broken arm
in 2002."  Id. at p. 894.  Dr. Huot wrote "at that time, she had a cast placed
which was placed too tight and her arm set up wrong.  She needed to then
have it re-broken and a second cast was placed.  Shortly after the injury she
started having discoloration and sensitivity and symptoms of sympathetic
instability of the right arm."  Id.  Dr. Huot continued "since then she has had
progressively worsening of symptoms in terms of pain."  He noted that she had
undergone "extensive treatment of this to include stellate ganglion blocks,
scrambler treatment, medications which she continues to be on,
desensitization techniques and really the only thing that has help[ed] for any
period of length is the medications which she continues to be on, Percocet,
Methadone and Topamax.  The other interventions helped but were short-

21

lived". <u>Id.</u>  Dr. Huot noted that "she has a burning pain that is all the time in her arm." <u>Id.</u>

At the request of the SSA, Dr. Lauren Frey, a neurologist, reviewed Hughes' records. <u>Id.</u> at pp. 46 & 2147-55.  Dr. Frey diagnosed Hughes with CRPS. <u>Id.</u> at pp. 2147-55.  Dr. Frey opined that any increase in mental or physical demands in the environment would be predicted to cause Hughes to decompensate due to her CRPS. <u>Id.</u> at p. 46.

Dr. Huot's statement that Hughes' "debilitating pain prevents her from being able to work a normal workday" is not inconsistent with the conservative treatment history and the mostly normal physical examinations, in light of the medical record as a whole.  Thus, the ALJ's claim to the contrary is not a good reason to discount Dr. Huot's credibility.

Fourth, the ALJ disregarded Dr. Huot's opinion to due to Dr. Langbehn's opinion that Hughes was "able to function in life with the current medications," but noted she "would be unable to function or use the right upper extremity without medications (AR 1913 & 1916)." <u>Id.</u> at p. 1406.  It is correct that Dr. Langbehn opined the above statement; however, her opinion does not contradict Dr. Huot's opinion when considered in context of the clinical note as a whole and Hughes' medication and highly structured life.  "[A] claimant need not prove she is bedridden or completely helpless to be found disabled." <u>Reed</u>, 399 F.3d at 923 (citation omitted).  SSR 03-2p reminds ALJs that "[i]t should be noted that conflicting evidence in the medical record is not unusual in cases of RSDS due to the transitory nature of its objective findings and the

22

complicated diagnostic process involved" and symptoms of RSDS are transient in nature; this transient nature must not affect a finding that the condition is a medically determinable impairment.  SSR 03–2p, 2003 WL 22399117.  Other treatment notes state Hughes showed "right upper extremity decreased ROM.  Positive allodynia.  No hair or nail growth changes."  (AR 1915).  Nonetheless, Dr. Langbehn diagnosed Hughes with CRPS "Type I of [the] right upper extremity."  Id. at p. 1916.  This is not a "good reason" to discount Dr. Huot's statement.

Fifth, the ALJ discounted Dr. Huot's opinion because Hughes "began weaning off pain medications without a significant exacerbation or worsening in pain, which conflicts with the description of the claimant's functioning without pain medications" (AR 1980, 1984, 1994, 1999, 2014, 2035, & 2051).  (AR 1406).  While it is true that from June 11, 2018, to February 11, 2019, Hughes started to "wean off opioids;" it is not true that she weaned without a significant exacerbation or worsening in pain.  Id. at p. 1994.  The AR illustrates that while weaning off opioids she "noticed an increase in pain."  Id. She also begun using alternative therapy methods including deep flotation therapy.  Id. at p. 1980.  Further, the citation provided does not show a significant wean off opioids but rather a gradual, minimal decrease.  Id. at p. 2051.  Therefore, this is not a good reason to discount Dr. Huot's opinion.

Sixth, the ALJ found that Hughes' daily activities and exercise routine conflict with this statement," namely:

(1) "in November 2014, she was able to complete her activities of daily living independently (AR 494);" (2) "[i]n a function report

23

> completed in June 2014, the claimant reported that she was able
> to care for her young daughter, handle personal care with some
> difficulty, prepare simple meals, perform household chores when
> feeling good, drive daily, shop in stores daily for 30 to 120 minutes
> at a time, and handle finances (AR 254-61);" (3) "[i]n October 2014,
> she reported to a consultative examiner that she 'will spend her
> days getting her daughter ready for school and can cook meals, do
> laundry, make beds, do shopping and clean dishes' (AR 694);" (4)
> "in October 2015, she reported that she had been exercising at the
> gym with a personal trainer (AR 828);" and (5) "in February 2018,
> the claimant reported that she had been 'exercising ferociously' (AR
> 1879)."

Id. at p. 1406.

The ALJ failed to consider the effect of Hughes' highly structured life on her ability to function in the workplace. The AR and the JSMF outline Hughes' lifestyle. For example, Hughes testified that she is presented with "fairly few" stressors because she has a routine that she's "set in." Id. at p. 1471. When faced with "a stressor or reaction it causes [her] anxiety to go through the roof. [She] get[s] shortness of breath. [She] just get[s] really agitated." Id. The court will address the reasons the ALJ gave for discrediting Dr. Huot's opinion.

First, it is true that on June 12, 2014, Dr. Holley wrote Hughes "[c]ompletes [activities of daily living] ADL's independently." Id. at p. 494. It is also true that on June 4, 2014, eight days prior, Hughes saw Dr. Lord for an emergency appointment; Hughes was in the emergency room the night prior for a panic attack that caused jerking and twitching. Id. at p. 745. Dr. Lord noted Hughes' mother was present and would "be keeping close tabs on her while caring for her child." Id. at p. 746. On June 11, 2014, Dr. Lord saw Hughes and reported she "continues to struggle." Id. at p. 744. Dr. Lord noted Hughes "initially had her sister and mother stay with her; but now that she is down the

24

road with the crisis, she is staying at her own place." Id.  Hughes' sister,
Natalie Randall, testified that since May of 2015, she and her mother would
help Hughes when she was having difficulties with her depression and anxiety.
Id. at p. 1447.  As held in Stickler, "the ability to do activities such as light
housework and visiting with friends provides little or no support for the finding
that a claimant can perform full-time competitive work." Stickler v. Colvin, 173
F. Supp. 3d 925, 941–42 (D.S.D. 2016) (quoting Hogg, 45 F.3d at 278–79).
Like Stickler, Hughes is able to manage "activities of daily living
independently," care for her young daughter, and exercise.  In both cases the
treating psychiatrist opined the claimant was unable to hold full time
employment.  Hughes' disability must be considered in light of her structured
environment.  The ALJ failed to consider the effects of Hughes' highly
structured life and her ability to function outside of those settings.  Therefore,
this was not a good reason to discount Dr. Huot's statement.

Second, in June 2014, Hughes reported, in a function report, that she
was able to care for her young daughter, handle personal care with some
difficulty, prepare simple meals, perform household chores when feeling good,
drive, shop in stores for 30 to 120 minutes at a time, and handle finances.  Id.
at pp. 254-61.  The ALJ cited this statement to show that Hughes' daily
activities and exercise routine conflict with Dr. Huot's statement.  Id. at p.
1406.  The ALJ failed to consider the functional report as a whole and instead
cherry-picked Hughes' statements.  In the functional report, Hughes stated she
has to "have help from [her] Mom and sister to take care of [her] daughter, [to]

25

get thu [sic] [her] daily routine." <u>Id.</u> at p. 255.  She stated before her illness she "was able to have a schedule and accomplish routine daily activities." <u>Id.</u>  She also stated her "pain is so erratic and unpredictable which makes it nearly impossible to have a routine daily schedule.  [She] do[es] have periodic times throughout the day when [she] feel[s] good enough to get up and get things done, but the timing and duration of these 'feel good' moments are never the same." <u>Id.</u> at p. 254.  Also, as discussed earlier, the ALJ must be mindful that in regard to mental disorders, the Commissioner's decision "must take into account evidence indicating that the claimant's true functional ability may be substantially less that the claimant asserts or wishes." <u>Hutsell v. Massanari</u>, 259 F.3d 707, 713 (8th Cir. 2001) (citation removed).  Although Hughes reported she was able to do activities of daily living, this must be considered in the context of her mental disorder and her highly structured life, including the help she receives from her mother and sister.  (AR 1447).  Because the ALJ failed to do so, this is not a good reason to discount Dr. Hout's credibility.

Third, the ALJ cited to Hughes' October 2014 statement that she "spend[s] her days getting her daughter ready for school and can cook meals, do laundry, make beds, do shopping and clean dishes (AR 694)". <u>Id.</u> at p. 1406.  This citation (AR 694) was not in the transcript given to the court.  However, as earlier discussed Hughes' daily activity must be considered in light of her highly structured life. The ALJ failed to take Hughes' highly structured life into consideration.  Furthermore, "it is well-settled law that 'a claimant need not prove she is bedridden or completely helpless to be found disabled.' "

26

Reed, 399 F.3d at 923 (citing Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)); see Stickler, 173 F. Supp. 3d at 941-42 (citation omitted) ("the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work"). Therefore, this is not a "good reason" to discount Dr. Huot's statement.

Fourth, the ALJ opined that Hughes' ability to exercise at the gym with a personal trainer discounted Dr. Huot's belief that Hughes' debilitating pain prevents her from being able to work a normal workday (AR 828). (AR 1406). Standing alone, the fact that she had a personal trainer is not a good reason to discount Dr. Huot's opinion. The ALJ is not informed as to what types of exercises Hughes was able to complete or any other details of her exercise routine. As previously discussed, the Stickler court held that "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." Id. (quoting Hogg, 45 F.3d at 278–79. Like Stickler, Hughes is able to manage "activities of daily living independently," care for her young daughter, and exercise. In both cases the treating psychiatrist opined the claimant was unable to hold full time employment. Hughes' disability must be considered in light of her structured environment. The ALJ failed to consider the effects of Hughes' highly structured life and her ability to function outside of those settings. Thus, this was not a good reason to discount Dr. Huot's statement.

Fifth, the ALJ opined that Hughes' statement that she was "exercising ferociously" contradicted Dr. Huot's opinion. Id. at p. 1406. However, as

27

discussed earlier, the ALJ must be mindful that in regard to mental disorders, the Commissioner's decision "must take into account evidence indicating that the claimant's true functional ability may be substantially less that the claimant asserts or wishes."  Hutsell, 259 F.3d at 713 (citation removed).  Although Hughes reported she "exercised vigorously," there is no evidence of what that means.  Individuals, especially those with a mental disorder, may inaccurately describe their exercise condition.  The ALJ failed to consider the effect of Hughes' mental disorder on her statement; therefore, this was not a good reason to discount Dr. Huot's opinion.

**B. The ALJ erred by rejecting Hughes' credibility.**

Hughes argues the ALJ improperly rejected her credibility regarding her physical and psychological symptoms.  (Doc. 12).  Commissioner argues the ALJ properly considered Hughes' subjective complaints.  (Doc. 15).

"If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, [the court] will normally defer to that judgment."  Hogan, 239 F.3d at 962.  The Eighth Circuit has repeatedly "held that acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility."  Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010) (quoting Heino v. Astrue, 578 F.3d 873, 881 (8th Cir. 2009)).  "Another factor to be considered is the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence."  Id.; see Reed, 399 F.3d at 920 (an ALJ may determine that a claimant's

28

subjective complaints are not credible when there is objective medical evidence to the contrary; but, an "ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence"); Jones v. Astrue, 619 F.3d 963, 975 (8th Cir. 2010) ("ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary").

"The interpretation of physicians' findings is a factual matter left to the ALJ's authority." Adamczyk v. Saul, 817 F. App'x 287, 289 (8th Cir. 2020) (citing Clay v. Barnhart, 417 F.3d 922, 930 (8th Cir. 2005)).  However, the ALJ cannot "play doctor," meaning that the ALJ cannot draw improper inferences from the record or substitute a doctor's opinion for his own.  Id.; Pate-Fires v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009) ("the ALJ's determination [that the claimant's] medical noncompliance is attributable solely to free will is tantamount to the ALJ 'playing doctor,' a practice forbidden by law"); Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir. 1975) (an ALJ "may not draw upon his own inferences from medical reports").

Credibility determinations are primarily for the ALJ and not the court; this determination must be based on substantial evidence.  Reed, 399 F.3d at 920 (quoting Haley, 258 F.3d at 747).  The review of a decision to deny benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must] take into account whatever in the record fairly detracts from that decision."  Id.

**1. Physical Condition**

The ALJ found Hughes' "subjective complaints regarding her chronic pain and dysfunction in the right upper extremity [to not be] wholly consistent with the medical and other evidence" and Hughes' daily activities "were not as limiting as one would expect from an individual alleging disability." (AR 1401 & 1403). The ALJ found Hughes' subjective complaints, regarding her CRPS and dysfunction in the right upper extremity to be inconsistent with the medical and other evidence, namely:

> (1) Normal X-rays of the right shoulder and right elbow from October 2014 (AR 691-92); (2) normal nerve conduction testing of the right upper extremity (AR 1018-19); (3) In February 2014, Hughes was observed with full motor strength, full range of motion of the right upper extremity, and normal skin (AR 446); (4) Physical examinations conducted in February, August, and December 2014 were normal (AR 673, 682-83, 699-700, & 718-19); (5) At a October 2014 examination, Hughes was observed with a normal range of motion, intact reflexes, and intact sensation except for the right hand (AR 694-97); (6) in July 2016, at an evaluation of her right upper extremity pain, she was observed with sensitivity to the right hand, pain to palpation of the right shoulder, and "good function of the right arm" (AR 894); (7) in December 2017, the month of the date last insured, Hughes was observed with right upper extremity pain with a decreased range of motion but no hair or nail changes (AR 1915); (8) the record contains no other significantly abnormal clinical observations of the right upper extremity prior to the date last insured; (9) Hughes did not seek any care from a primary care provider for over one year, between 2014 and 2015 (AR 826); and (10) Hughes' right upper extremity pain and strength had improved under conservative care (AR 1932, 1980, 1984, 1994, 1999, 2014, 2035, & 2051).

Id. at pp. 1401-02 (modified).

First, it is true that Hughes' October 2014 X-ray of her right shoulder and elbow illustrated unremarkable results. Id. at pp. 691-92. It is also true that on February 12, 2004, Hughes had an MRI of her right shoulder which

30

showed a mild signal intensity elevation within the intact supraspinatus
tendon, compatible with mild supraspinatus tendonitis, trace amount of fluids
seen in the subdeltoid and subacromial bursal spaces, which suggested of mild
bursitis, and mild hypertrophic degenerative change of the acromioclavicular
joint.  Id. at pp. 1076-77.  On March 8, 2013, Dr. Lord noted she has "severe,
chronic pain is back in her neck and shoulders and [] has not been able to
work very effectively."  Id. at p. 404.  In November 2015, Hughes' MRI showed a
supraspinatus and subscapularis tendonitis along with a superior labral tear
extending from the mid-anterior to posterior superior labrum.  Id. at p. 847.
Hughes complained of pain in her right arm, upper back, and shoulder over
the course of many years.   See id. at pp. 402, 516, 529, 532, 844, 874, 894,
1185, 1034-36, 1070, 1189, 1194, 1247, 1896-99 & 1906.  The record is
replete with examples of Hughes receiving injections for her right shoulder pain
over the years, which she reported gave her "significant relief."  Id. at pp. 402 &
894.  Because there are many medical issues in the upper extremities that
would not appear on an x-ray, the court does not find Hughes' X-ray of her
right shoulder and elbow to be a good reason to discount Hughes' credibility.

Second, on April 24, 2002, Hughes underwent a motor and sensory
nerve study for her history of right radial ulnar fracture and present right wrist
pain and numbness.  Id. at p. 1018.  The results of the nerve conduction study
and the needle examination were normal, with no electrophysiologic evidence of
right median or ulnar neuropathy, brachial plexopathy, or cervical
radiculopathy.  Id. at p. 1019.  This study occurred approximately nine years

prior to Hughes' onset disability date.  Due to the historic nature of the study, it is not a good reason to discount Hughes' credibility.

Third, the ALJ stated that in February 2014, Hughes was observed with full motor strength, full range of motion of the right upper extremity, and normal skin.  Id. at p. 446.  The court does not find that the AR supports the ALJ's claim.  In this courts prior ruling, it held that "[c]linical objective observations regarding claimant[']s swelling, changes in skin color or texture . . . can be found at JSMF paragraphs 22, 24, 64, 98, 101, and 110-116" [5] . . . there does not appear to be any dispute that Ms. Hughes suffers from CRPS." Id. at p. 1524.  The record is composed of many examples of Hughes' difficulties with her musculoskeletal functions and skin.  The ALJ's third rational for discounting Hughes' credibility was not supported by the AR.

Fourth, the ALJ argues the "physical examinations conducted in February, August, and December 2014 were [] normal (AR 673, 682-83, 699-700, & 718-19)."[6]  Id. at p. 1401.  This is incorrect.

On February 12, 2014, Hughes was seen in the emergency department, complaining of shortness of breath and pressure in her chest.  Id. at p. 673. The ALJ's belief that Hughes had a normal physical examination is incorrect.

In August 2014, Hughes was seen for "shortness of breath [and] pain [in] back of right leg."  Id. at pp. 682; 699.  Dr. Tibbles noted Hughes "experienced

---

[5] The JSMF citations were amended to match the current JSMF (Doc. 11).
[6] AR 682-83 and AR 699-700 are the same citation.

increasing shortness of breath with exertion" and has a history of pulmonary emboli, DVT, and RSDS/CRPS.  Id.  Hughes' examination was not normal.

In December 2014, Hughes arrived at the ER, complaining of shortness of breath.  Id. at p. 718.  Dr. Brook Eide opined that Hughes is suffering from "chronic constipation" as "there appears to be a large amount of formed stool in the splenic flexure."  Id. at p. 719.  This is not a normal physical examination.

The ALJ's belief that the physical examinations discussed above were normal is not supported by the AR; thus, it is not a "good reason" to discount Hughes' credibility.

Fifth, the ALJ discounted Hughes' credibility due to her October 2014 consultative examination in which she was "observed with a normal range of motion of the right shoulder, right elbow, and right forearm, an impaired range of motion of the right wrist, a normal gait, full motor strength except for the right wrist, intact reflexes, and intact sensation except for the right hand (AR 694-97)."[7]  Id. at p. 1401-1402.  In that same examination, Dr. Norlin noted Hughes had diminished sensation in the right upper extremity in the hand and neuropathy of the right wrist and hand.  Id. at p. 697.  Dr. Norlin diagnosed Hughes with chronic pain of the right wrist following a fracture which resulted in RSDS/CRPS causing chronic pain and limited dexterity of the right hand. Id. at p. 697; JSMF ¶ 217.  Dr. Norlin's opinion supports Hughes' claim of limitation rather than contradicting it.  Thus, this finding is not a good reason to discount Hughes' credibility.

---

[7] AR 694 was not in the transcripts provided to the court.  (Doc. 6).

Sixth, "[i]n July 14, 2016, at an evaluation of her right upper extremity pain, she was observed with sensitivity to the right hand, pain to palpation of the right shoulder, and 'good function of the right arm' (AR 894)." (AR 1402). The evaluation also stated that Hughes had "right upper extremity complex regional pain syndrome," "right shoulder degenerative joint disease/pain," and "right subscapularis and supraspinatus tendinitis." Id. at p. 894. Hughes scheduled the appointment with Dr. Huot because she was suffering from right shoulder pain which she felt affected her ability to use her arm and had been very severe in nature. Id. He noted he saw Hughes for right arm pain "due to a history of [CRPS], which started with a broken arm in 2002." Id. The day after this examination, Dr. Huot wrote a letter stating "despite extensive treatment[,] she is left with debilitating pain on a daily basis. It is [his] belief that this debilitating pain prevents her from being able to work a normal workday. . . . [I]n terms of her prognosis, [he] feel[s] she has reached maximal improvement and unfortunately, will likely have this pain problem long term." Id. In the light of Dr. Huot's entire statement and AR, Hughes's singular instance of good functioning of her right arm is not a good reason to discount her credibility.

Seventh, the ALJ found Hughes' subjective complaints are not wholly consistent with the observation that Hughes "was observed with right upper extremity pain with a decreased range of motion but no hair or nail changes (AR 1915)." Id. at p. 1402. The court does not find that Hughes' minimal records on lack of hair or nail changes, standing alone, to be a good reason to discount her credibility. In April 2016, Hughes saw Dr. Lord reporting her hair

had been falling out.  Id. at p. 859.  Abnormal hair or nail growth, either too fast or too slow, is associated with RSDS/CRPS.  See Cleveland Clinic, Complex Regional Pain Syndrome (CRPS), https://my.clevelandclinic.org/health/ diseases/12085-complex-regional-pain-syndrome-crps.  Abnormal hair or nail growth is not required for a diagnosis of CRPS.  Id.  In 2017, CNP Langbehn diagnosed Hughes with "Complex Regional Pain Syndrome, Type I of right upper extremity," although she had "[n]o hair or nail growth changes."  Id. at p. 1915-16.  This is not a good reason to discount Hughes' credibility.

Eighth, the ALJ stated "the record contains no other significantly abnormal clinical observations of the right upper extremity prior to the date last insured," which is December 2017.  Id. at p. 1402.  However, on March 8, 2018, and June 4, 2018, Hughes was examined by CNP Langbehn, who continued to diagnose Hughes with CRPS Type I.  Id. at pp. 1936 & 1960-61.  On February 28, May 23, June 25, and October 17, 2018, Hughes was seen by Dr. Lord, who reported Hughes struggled with her psychological symptoms and had "significant residual dysphoria, anhedonia and high reactivity to environmental stressors, as well as chronic pain interface."  (JSMF ¶¶ 211-12).  Therefore, this is not a good reason to discount Hughes' credibility.

Ninth, the ALJ discounted Hughes' subjective complaints due to her not seeking "care from [her] primary care provider for over one year, between 2014 and 2015.  (AR 826)."  (AR 1402).  While true, this is not a good reason to discount Hughes' credibility.  During that time period, Hughes presented to the emergency room, and was hospitalized for respiratory distress.  Id. at p. 646-

35

49.  On July 2, October 20, November 20, and December 22, 2014, Hughes saw a physician or other care provider.  Id. at pp. 124, 125, 126, & 127.  Also, the ALJ failed to consider Hughes' highly structured environment.  Thus, this is not a good reason to discount her credibility.

Tenth, the ALJ opined that Hughes' provider noted that in March 2018, her right "upper extremity pain and strength had improved under conservative care (AR 1932, 1980, 1984, 1994, 1999, 2014, 2035, & 2051)."  Id. at p. 1402. It is true that in March 2018, CNP Langbehn examined Hughes and noted "exercise has strengthened her shoulder."  Id. at p. 1402.  The ALJ cited to AR 1994, which is Langbehn's August 27, 2018, examination where she noted Hughes continued to wean off Methadone and was noticing an increase in pain but wants to continue the wean.  Id. at p. 1994.  The other citations do not support the claim that Hughes' right upper extremity pain and strength had improved; thus, it is not a good reason to discount Hughes' credibility.

### 2. Mental Conditions

The ALJ found Hughes' "subjective complaints regarding the severity of her anxiety and depression are not consistent with the mostly normal mental status examinations, the conservative treatment history, and the statements in the treatment record of improved and controlled mental health symptoms with medication alone," namely:

> (1) The clinical observations do not illustrate persistent symptoms of depression or anxiety or significant side effects from medication; (2) Hughes was observed as pleasant and cooperative and with a normal mood, normal affect, fair insight, and fair judgment (AR 434, 446, 488, 496, 524, 526, 530, 533, 554, 559, 571, 578, 603, 611, 617, 649, 673, 678, 683, 694-97, 700, 712, 718, 894, 966,

36

> 984, 994, 1005, 1915, 1936, & 1961); (3) she had intact memory
> (AR 434, 446, 488, 649, 673, 678, 683, 909, 984, 994, & 1005);
> (4) she had intact attention and concentration and was cognitively
> on task, alert, coherent, and oriented (AR 392-430, 496, 744-70,
> 820-34, 857-63, & 1859-94).

Id. at pp. 1402-03.  The ALJ found Hughes' subjective complaints to be inconsistent with the objective medical evidence; however, the ALJ must be mindful that "mental impairments can wax and wane."  Wellman, 4:16–CV–04159, 2017 WL 5990116, at *19 (quoting Nowling, 813 F.3d at 1123; Dillon v. Colvin, 210 F. Supp. 3d 1198, 1209 (D.S.D. 2016)).  A claimant may experience periods where they are apparently healthy, while at other times they experience debilitating effects from their impairments.  Id. (citing Dillon, 210 F. Supp. 3d at 1209 (bipolar and anxiety disorder are conditions commonly known to wax and wane.  It is not unexpected for an individual with these conditions to appear and act healthy, while at other times to suffer from the extreme, debilitating problems these physical and mental conditions cause.")).  If a claimant's improvement coincides with her being in a highly structured environment, such improvement is not indicative of not being disabled.  An ALJ must consider the effects of "structured setting" when drawing conclusions about a person's ability to work from looking at their daily activities.  Nowling, 813 F.3d at 1122-23; 20 C.F.R. § pt. 404, subpt. P, app. 1.

The ALJ opined "the claimant's daily activities were not as limiting as one would expect from an individual alleging disability." (AR 1402).  When drawing conclusions about a person's ability to work from looking at their daily activities, an ALJ must consider the effects of "structured setting."  Nowling,

37

813 F.3d at 1122-23; 20 C.F.R. § pt. 404, subpt. P, app. 1.  If a claimant's symptomatology is controlled or attenuated by psychosocial factors, ALJs must consider their ability to function outside of such highly structured settings.  Id. Here, the ALJ failed to consider the effects of Hughes' highly structured life and her ability to function outside of those settings.

Hughes' case is similar to Stickler in which the claimant had great difficulties psychologically in leaving the house and their treating psychiatrist said she was unable to hold full time employment.  Stickler, 173 F. Supp. 3d at 941-42.  The court held that "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."  Id. (quoting Hogg, 45 F.3d at 278–79).  Additionally, when the ALJ does not identify the evidence in the record that supports a finding that the claimant can regularly leave his home and when none of claimant's daily activities are inconsistent with the claim that he cannot, this court finds that the ALJ's determination is not supported by substantial evidence in the record.  Loomis v. Kijakazi, 5:21-cv-05005, 2022 WL 3594043 (D.S.D. Aug. 22, 2022).

First, the ALJ opinion that the clinical observations do not illustrate persistent symptoms of depression or anxiety or significant side effects from medication is not supported by the AR.  (AR 1402).

Hughes' treating psychiatrist, Dr. Lord treated her 47 times and opined she suffered from anxiety, depression, residual dysphoria, and some anhedonia.  Id. at pp. 402, 404-05, 744, 1525, & 1527.  He also opined she

had marked restrictions in several areas and that she was "highly reactive to environmental stressors." Id. On December 14, 2006, Dr. Cherry, a neuropsychologist at Regional Rehabilitation Institute opined Hughes had depression and anxiety in conjunction with her pain. Id. at p. 1251.

In this court's prior decision, it held that the ALJ's decision that Hughes' mental impairments (anxiety and depression complicated by chronic pain and metabolic deficiencies) were not severe was erroneous. Id. at p. 1528. The Court rejected the ALJ's dismissal of Dr. Lord's opinions, writing "the treatment records of Dr. Lord are replete with examples of the effects of Ms. Hughes' depression and anxiety, including not leaving the house for several days, presentation with psychomotor retardation, needing family [to] come assist her with child care due to her limitations, difficulty with concentration, focus, and memory, insomnia, being anxious about taking her daughter to school, anxious about going anywhere, [and] being avoidant." Id. at pp. 1527-1528. The Court held that the ALJ's rejection of Dr. Lord's opinion that Hughes was "definitely disabled regarding her ability to function, hold [a] job and follow through" was erroneous. Id. at p. 1528.

Therefore, the ALJ's claim that the clinical observations do not illustrate persistent symptoms of depression or anxiety or significant side effects from medication is not supported by the AR. (AR 1402).

Second, the ALJ found the severity of her anxiety and depression were inconsistent with Hughes' appearance of being pleasant and cooperative and having a normal mood, normal affect, fair insight, and fair judgment. Id.

39

Hughes appearance in the doctor's office is not necessarily indicative of the condition of her depression and anxiety.  Also, as discussed, "mental impairments can wax and wane." Wellman, 4:16–CV–04159, 2017 WL 5990116, at *19 (quoting Nowling, 813 F.3d at 1123; Dillon, 210 F. Supp. 3d at 1209.  The ALJ also must be mindful that the transient nature of CRPS must not affect a finding that the condition is a medically determinable impairment.  SSR 03–2p, 2003 WL 22399117, at *4.  Thus, this is not a good reason to discount Hughes' credibility.

Third, ALJ found the severity of her anxiety and depression were inconsistent with Hughes' intact memory.  Id. at p. 1402.  However, there is evidence of care providers opining that Hughes has "trouble with concentration and focus and memory."  Id. at p. 401, 745, & 755.  Further, Hughes' memory is not correlated with the severity of her anxiety and depression; therefore, this is not a good reason to discount Hughes' credibility.

Fourth, the ALJ discounted Hughes credibility because she was reported to have intact attention and concentration and was cognitively on task, alert, coherent, and oriented (AR 392-430, 496, 744-70, 820-34, 857-63, & 1859-94).  The ALJ failed to consider the AR as a whole.  For example, in July 2016, Dr. Lord opined that Hughes had "severe memory, concentration and focus impairment due to depression/metabolic/chronic problems – treatment resistant mood disorder complicated by chronic pain and metabolic deficiencies.  Severe insomnia, panic attacks, anxiety, and multiple medication side effects.  Mood swings, memory problems, [word unknown], fatigue

40

sensitivity to stress is extremely high." Id. at pp. 864-65.  Dr. Lord opined that

these limitations were first present "two years ago."  Id.  In April 2020, Dr. Lord

noted "she does struggle with hypersomnia, panic attacks, mood/reactivity.

She's disabled from her illness and even though she's tried to work, she's not

been capable of following through." Id. at p. 2229.

  "Chronic pain and many of the medications prescribed to treat it may

affect an individual's ability to maintain attention and concentration, as well as

adversely affect his or her cognition, mood, and behavior, and may even reduce

motor reaction times.  These factors can interfere with an individual's ability to

sustain work activity over time or preclude sustained work activity altogether.

When evaluating duration and severity, as well as when evaluating RFC, the

effects of chronic pain and the use of pain medications must be carefully

considered."  See Program Operations Manual System[8] ["POMS"], DI 24580.025

Evaluation of Reflex Sympathetic Dystrophy Syndrome/Complex Regional Pain

Syndrome (RSDS/CRPS)--SSR 03- 2p,

https://secure.ssa.gov/poms.nsf/lnx/04245

80025.  On November 18, 19, 21, 25, and 26, 2013, Hughes received Ketamine

infusion therapy treatment at the Omega Interventional Pain Clinic.  (JSMF ¶¶

111, 112, 113, 114, 115, 116, & 117).  Dr. Lord noted the Ketamine infusion

treatments were unsuccessful for her chronic pain.  (AR 394).  Hughes testified

she believes she needs to rest due to taking a number of medications, which

---

[8] "The POMS is a primary source of information used by Social Security
employees to process claims for Social Security benefits.

makes her feel "pretty groggy at times." (AR 1431). The ALJ failed to take Hughes' chronic pain and medications effect on her ability to maintain attention and concentration. Therefore, this is not a good reason to discount Hughes' credibility.

Read as a whole, Hughes' treatment notes indicate her symptoms waxed and waned with some short-term improvement but without substantial long-term worsening or improvement. Hughes' improvements occurred when she was in a highly structured environment. The ALJ did not fully consider Hughes' psychological condition. The ALJ failed to consider the AR as a whole and the effects of Hughes' highly structured life and her ability to function outside of those settings. See Nowling, 813 F.3d at 1122-23 ("Simply put, the nature of the medical condition and the nature of the life activities, including such considerations as independence, should be considered against the backdrop of whether such activities actually speak to claimant's ability to hold a job. Participation in activities with family or activities at home and at 'your own pace' may not reflect an ability to perform at work."). Hughes' subjective complaints regarding the severity of her anxiety and depression are consistent with the AR.

## C. Hughes met Listing 12.04(C) as of September 1, 2013

Hughes alleges the ALJ erred by determining she did not meet or equal listing 12.04, as of her amended onset date of September 2013. (Doc. 12, p. 1).

42

The Listing of Impairments "describes for each of the major body systems impairments that [are considered] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). If a claimant has an impairment that "meets or equals" a Listing, the claimant is presumed disabled. Cronin v. Saul, 945 F.3d 1062, 1067 (8th Cir. 2019); 20 C.F.R. § 404.1520(d) ("If you have an impairment(s) which meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment(s), we will find you disabled without considering your age, education, and work experience."). The burden is on the claimant to demonstrate that their impairment meets or equals a listing; it is not upon the Commissioner to show that the claimant does not satisfy a listing. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).

Listing 12.04(C) [9] requires a claimant to have a "serious and persistent" mental disorder, i.e., "a medically documented history of the existence of the disorder over a period of at least 2 years" and evidence of both "[m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the claimant's] mental disorder"; and "[m]arginal adjustment, that is, [the claimant has] minimal capacity to adapt to changes in [his or her]

---

[9] Listing 12.04 focuses upon affective disorders which are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." 20 C.F.R. Part 404, Subpt. P, App. 1 §§ 12.04(C).

environment or to demands that are not already part of [his or her] daily life."  20 C.F.R. Part 404, Subpt. P, App. 1 §§ 12.04(C).

Listing 12.04 was recently amended.  When Listing 12.04 was amended, the SSA provided guidance, both to the ALJ and to the court, on whether the amended rules would apply to a specific claim.  See Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,137, 66,138 (Sept. 26, 2016). For claims before the ALJ, the amended rules would apply "to new applications filed on or after the effective date of the rules, and to claims that are pending on or after the effective date."  Id. at 66,138 n.1.  As for claims before courts, the SSA "expect[ed] that Federal courts will review [its] final decisions using the rules that were in effect at the time [the Commissioner] issued the decisions.  If a court reverses [the ALJ's] final decision and remands a case for further administrative proceedings after the effective date of these final rules, [the ALJ] will apply these final rules to the entire period at issue in the decision [the ALJ] make[s] after the court's remand."  Id.   The rules became effective January 17, 2017.  Id.  Because this court reversed Hughes' claim and it was heard on remand on March 23, 2021, after the amended rules effective date of January 17, 2017, Hughes' disability will be evaluated under the amended Listing 12.04.

In this case, the ALJ found "the severity of the claimant's mental impairments, considered singly and in combination, did not meet or medically

equal the criteria of listings 12.04 and 12.06." (AR 1398). Hughes argues listing 12.04(C) was met.[10] (Doc. 12, pp. 17-18).

Dr. Atkin, a psychological expert hired by the SSA, opined that Hughes met Social Security listing 12.04(C), and was therefore presumptively entitled to Social Security disability benefits. (AR 36-61). The ALJ discounted Dr. Atkin's opinion because

> (1) other than medication, Hughes received no significant treatment for her mental health; (2) throughout the relevant period, Hughes reported improved moods and pain with medication (AR 750, 822, 824, 828, 832, 1872, 1879, & 1916); (3) Hughes reported that she does "ok" handling changes in routine and that she felt adaptable (AR 260); (4) Dr. Lord's consistent reporting that Hughes had "no history of paranoia, psychotic regression or hallucinatory activity" (AR 260, 392-430, 744-70, 820-34, 1204-39, & 1859-94) . . . and was consistently observed as pleasant and cooperative and with a normal mood, normal affect, fair insight, and fair judgment; and (5) the mild and moderate "paragraph B" ratings from Dr. Atkin are not fully consistent with his "paragraph C" criteria determination.

Id. at p. 1407.

First, the fact that Hughes is treating her mental illness through medications and psychotherapy is not a good reason to reject Dr. Atkin's opinion. The ALJ cannot "play doctor" and opine that more than medication is required for listing 12.04(C). Adamczyk v. Saul, 817 F. App'x 287, 289 (8th Cir. 2020). Therefore, this is not a good reason to reject Dr. Atkin's opinion.

Second, it is true that Hughes "reported improved moods and pain with medication." Id. As previously mentioned, mental impairments can wax and wane. Wellman, 4:16–CV–04159, 2017 WL 5990116, at *19 (citing Nowling,

---

[10] Listing 12.04 may be met by showing criteria § 12.04(A) and (B) or (C).

813 F.3d at 1123; Dillon, 210 F. Supp. 3d at 1209).  A claimant may experience periods where they are apparently healthy, while at other times they experience debilitating effects from their impairments.  Id. (citing Dillon, 210 F. Supp. 3d at 1209 ("Conditions such as [] DVT, bipolar disorder and anxiety disorder are conditions commonly known to wax and wane.  It is not unexpected for an individual with these conditions to appear and act healthy, while at other times to suffer from the extreme, debilitating problems these physical and mental conditions cause.")).  If a claimant's improvement coincides with her being in a highly structured environment, such improvement is not indicative of not being disabled.  An ALJ must consider the effects of "structured setting" when drawing conclusions about a person's ability to work from looking at their daily activities.  Nowling, 813 F.3d at 1122-23; 20 C.F.R. § pt. 404, subpt. P, app. 1.  Read as a whole, Hughes' treatment notes indicate her symptoms waxed and waned with some short-term improvement but without substantial long-term worsening or improvement.  Hughes' improvements occurred when she was in a highly structured environment.  Thus, this is not a good reason to discount Dr. Atkin's opinion.

Third, it is true that Hughes reported that she does "ok" handling changes in routine and that she felt adaptable.  (AR 260).  The ALJ must be mindful that in regard to mental disorders, their decision "must take into account evidence indicating that the claimant's true functional ability may be substantially less that the claimant asserts or wishes."  Hutsell, 259 F.3d at 713 (quoting Parsons, 739 F.2d at 1341).

46

Further, this finding must be considered in light of Hughes' "highly structured" life.  For example, in June 2014, Hughes reported she needed help from her mom and sister to take care of her five-year-old daughter and "get through daily routine."  (AR 255).  She explained "there are some days [she is] not able to change out of pajamas, [she is] not able to bathe on a regular basis" and she needs to set an alarm to remind herself to get certain things done.  Id. at pp. 255-56.  She reported she "go[es] as few places as possible and take[s] part minimally."  Id. at p. 258.  She reported she used to be very socially active and always on the go but since 2002 she "rarely participate[s] in social events at all, especially if that involves more than two or three friends/family members."  Id. at p. 259.  At the first Social Security hearing, Hughes testified in an average day she takes her daughter to school in the morning, then comes home and rests for a "good hour."  Id. at p. 1430.  She said she rests because she feels like she is "worn out after just getting her ready for school."  Id.  She testified she believes she needs to rest due to taking a number of medications, which makes her feel "pretty groggy at times."  Id. at p. 1431.  She testified she can do chores for about 45 minutes before she needs to rest for an hour.  Id. at p. 1432.  She testified she has about four bad days and three good days in an average week although "it just really varies."  Id. at p. 1434.  Hughes testified that she is presented with "fairly few" stressors because she has a routine that she's "set in."  Id. at p. 1471.  When faced with "a stressor or reaction it causes [her] anxiety to go through the roof.  [She] get[s] shortness of breath.  [She] just get[s] really agitated."  Id.

47

Hughes' sister, Natalie Randall, testified at the second hearing.  Id. at pp. 1443-49.  Randall confirmed that since May of 2015, she would see her sister at least five days a week, as she sees her on weekends and checks in on her after work.  Id. at p. 1444.  She confirmed her mother and herself help with Hughes' daughter when Hughes is having difficulties with her depression and anxiety.  Id. at p. 1447.  The ALJ afforded minimal weight to Randall's testimony, finding that her testimony is "inconsistent with the mostly normal mental status examinations and physical examinations, the reports of improved pain, depression, anxiety, and side effects with medication changes, and the claimant's regular exercise regimen."  Id. at pp. 1407-08.  As discussed, Hughes' structure life is evidenced throughout the AR.  The ALJ's rational is not a good reason to discount Randall's credibility.

This case is similar to Stickler in which the claimant had great difficulties psychologically in leaving the house and their treating psychiatrist said she was unable to hold full time employment.  Stickler, 173 F. Supp. 3d at 941-42.  The Stickler court held that "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."  Id. (quoting Hogg v. Shalala, 45 F.3d 276, 278–79 (8th Cir. 1995) ("the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work")); see Loomis, No. 5:21-CV-05005, 2022 WL 3594043 (When the ALJ does not identify the evidence in the record that supports a finding that the claimant can regularly

leave his home and when none of claimant's daily activities are inconsistent with the claim that he cannot, this court finds that the ALJ's determination is not supported by substantial evidence in the record).

Like Stickler, Hughes can manage her "activities of daily living independently," care for her young daughter, and exercise. In both cases the treating psychiatrist opined the claimant was unable to hold full time employment. Hughes' disability must be considered in light of her highly structured environment. The ALJ failed to consider the effects of Hughes' highly structured life and her ability to function outside of those settings. Therefore, this was not a good reason to discount Dr. Atkin's opinion.

Fourth, the ALJ discounted Dr. Atkin's opinion due to Dr. Lord's "consistent reporting that the claimant had 'no history of paranoia, psychotic regression or hallucinatory activity' (AR 260,[11] 392-430, 744-70, 820-34, 1204-39, & 1859-94)" and "consistently observed as pleasant and cooperative and with a normal mood, normal affect, fair insight, and fair judgment." Id. at p. 1047. These facts are not inconsistent. Dr. Lord's opinion that Hughes has marked restrictions on her ability to sustain concentration on a regular basis in the workplace, given her waxing and waning psychological symptoms has no correlation on her lack of history of paranoia, psychotic regression or hallucinatory activity or demeanor in the doctor's office. See 20 C.F.R. § 404, Subpt. P, App. 1 § 12.00C(3) (A claimant's ability to maintain concentration,

---

[11] AR 260 is Hughes' self-reported functional report, not Dr. Lord's report.

persistence, or pace refers to the "ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."). Therefore, this was not a good reason to discount Dr. Atkin's finding.

Fifth, the ALJ opined "the mild and moderate 'paragraph B' ratings from Dr. Atkin are not fully consistent with his 'paragraph C' criteria determination." Listing 12.04 is satisfied by A and B or C. B and C are not both required.[12]

The ALJ determined the "paragraph C" criteria was not satisfied as "[t]he record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of then claimant's daily life." (AR 1399). Hughes refutes the ALJ's finding that she did not meet the Part C criteria. (Doc. 12, pp. 9-18). The court will evaluate each step of the "paragraph C" criteria.

To satisfy the first requirement of paragraph C, Hughes must present medical evidence of the existence of a "serious and persistent" depressive disorder over a period of at least two years. The ALJ did not make any specific findings related to this requirement; however, the ALJ did opine that Hughes "has a long history of anxiety, depression, and chronic pain[.]" (AR 1403). The medical records consistently affirm Hughes' diagnosis of Bipolar I from Dr. Lord's January 8, 2013, opinion through Dr. Atkin's testimony at the third SSA

---

[12] Hughes does not contest the ALJ's finding that she did not meet the Part B criteria.

hearing.  Id. at pp. 41-42, 410-11, 746, 763, 857, & 1322.  Thus, there is

substantial evidence in the record of a medically documented history of Bipolar

I over a period of at least two years.

The second paragraph C criterion requires Hughes to demonstrate that

she received some medical or mental health treatment or a highly structured

setting that is ongoing and diminished the symptoms of her depressive

disorder.  20 C.F.R. Part 404, Subpt. P, App. 1 § 12.04(C).  Section 12.00D4

defines "treatment" for purposes of paragraph C2: "Treatment may include

medication(s), psychotherapy, or other forms of intervention, which you receive

in a doctor's office, during a hospitalization, or in a day program at a hospital

or outpatient program."  Id. at § 12.04(D).

Hughes received ongoing treatment in the form of medications and

counseling, as shown throughout the AR.  As discussed earlier, Dr. Lord was

Hughes treating psychiatrist, having treated her from January 22, 2008, until

February 19, 2021.  See Supra B.1; AR 429 & 2239.  After Hughes' September

1, 2013, onset date, Dr. Lord saw her 47 times.  (JSMF ¶ 6).  For example, in

January 2013, Hughes saw Dr. Lord, who noted that her "medical issues

continue to weigh in heavily regarding her ability to respond to her psychiatric

medication.  . . . her prognosis remains fair and she is just barely maintaining

with her current medication regime for her bipolar mood disorder and related

comorbid issues including anxiety, panic disorder intermittently, and seasonal

depression."  (AR 410-11).  In July 2015, Dr. Lord noted that she uses

Propranolol/Traxene to "manage her panic attacks and anxiety through the

51

day" she takes "Lamictal for mood/depression and is tolerating that reasonably well." Id. at p. 825.  Also, in April 2016, Dr. Lord reported Hughes is "taking Propranolol, Tranxene and Hydroxyzine four times daily," Abilify, which has helped her mood/mania, and Lamictal, which has helped her mood/depression. Id. at p. 859.  Hughes established she receives ongoing support which diminishes the symptoms of her disorder.

Additionally, Hughes lives in a highly structured environment, as discussed earlier and evidenced by the AR, including numerous doctor's notes and Hughes and her sister's testimony.  See Supra page 15, 24, 26-27, 38, & 48-49.  Hughes established that she received some medical or mental health treatment and she lives in a highly structured setting that is ongoing and diminished the symptoms of her depressive disorder; therefore, the second criteria of Listing 12.04(C) is met.

Third, the petitioner must establish that she has only minimal capacity to adapt to changes in her environment or to demands that are not already part of her daily life.  The ALJ held "[t]he record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of then claimant's daily life." (AR 1399).  The ALJ's finding is not supported by the AR.

Dr. Lord noted Hughes "has struggled with her bipolar condition and the interface with her medical problems [and] she remains highly reactive to environmental stressors." Id. at p. 763.

In its prior opinion, this Court noted that Dr. Atkin, a psychological expert hired by the SSA, testified that Hughes met Social Security listing 12.04, and was therefore presumptively entitled to Social Security disability benefits, because she had "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental or physical demands in the environment would be predicted to cause the individual to decompensate." Id. at p. 1526.  Dr. Atkin testified that Hughes' chronic pain and her mental health issues were comorbid and fed off each other.  Id.

At the 2016 administrative hearing, Dr. Atkin testified that he believed Hughes met Listing 12.04(C)(2) because her psychological condition resulted in "such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." (JSMF ¶ 226).  At the March 2021 hearing, Dr. Atkin testified that Hughes has only minimal capacity to adapt to changes in her environment or to demands that are not already part of her daily life, as she has "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental or physical demands in the environment would be predicted to cause the individual to decompensate." (AR 46).  Dr. Atkin testified that his opinion was supported by Dr. Lord's notes and the fact that "it's well understood in the literature that pain and mental health issues are comorbid and they feed off each other and she's had increasing medical difficulties.  She's had increased mental health difficulties.  [He] think[s] that her mental health difficulties reached this point in September of 2013.  Prior to

that [he doesn't] think that these limits are applicable.  There was less limitation prior to that." Id. at p. 47.  Dr. Atkin opined that Hughes' CRPS in combination with her depression and other medical problems brought "into play the Part C criteria" for Listing 12.04.  Id.  In conclusion, he opined Hughes "has multiple, significant medical problems which in combination have resulted in her susceptibility to minimal stress." Id. at p. 48.

Dr. Victoria Reid, a clinical psychologist, reviewed Hughes' records at the request of the SSA.  Id. at pp. 2157-64.  Dr. Reid diagnosed Hughes with anxiety and depression and opined that Hughes only had mild symptoms interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself.  Id. at pp. 2157-58.  Dr. Reid did not believe Hughes met a listing because "it is believed Claimant['s] use of pain medications or likely exacerbating mental health symptoms.  Claimant does suffer anxiety and depression but they do not markedly compromise functionality – cognitive functioning intact." Id. at p. 2159.  Dr. Reid did not believe Hughes had any restrictions on her ability to understand, remember, and carry out instructions and had mild restrictions on her ability to interact appropriately with supervisors, co-workers, and the public.  Id. at pp. 2162-63.  Dr. Reid believed "her anxiety and depression could complicate her persistence to maintain pace but not to a severe degree.  Her medical evidence for judgment, abstraction, and ability to calculate remains intact AR 392-439, 744-70, & 1859-94 noted to be cognitively intact." Id. at p. 2163.

The ALJ "afford[ed] some significant weight to Dr. Reid's opinion" that Hughes "impairments did not meet or equal a listing and that the claimant is 'clearly capable of maintaining simple repetitive employment' " Id. at p. 1408. The ALJ found "the mostly normal objective medical evidence, the conservative treatment history, and the claimant's daily activities and exercise regimen are generally consistent with Dr. Reid's responses." Id.

Dr. Lord and Dr. Reid's opinions differ on their belief on Hughes' condition. When opinions of consulting physicians' conflict with opinions of treating physicians, the ALJ must resolve the conflict. Wagner, 499 F.3d at 849. Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record, especially when they are contradicted by the treating physician's medical opinion. Id. However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's RFC determination, such a conclusion may be supported by substantial evidence. Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004). Also, where a nontreating physician's opinion is supported by better or more thorough medical evidence, the ALJ may credit that evaluation over a treating physician's evaluation. Flynn v. Astrue, 513 F.3d 788, 793 (8th Cir. 2008) (citing Casey v. Astrue, 503 F.3d 687, 691–692 (8th Cir. 2007)).

Dr. Reid is a consulting physician. As a non-examining, consulting physician, her opinion is not entitled to the same weight as Dr. Lord's or Dr. Huot's opinion. Because Dr. Lord and Dr. Huot are treating physicians and

their opinions are well-supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with the other substantial evidence in AR, the ALJ must give it controlling weight.  See 20 C.F.R. § 404.1527(d)(2); Section A.  Thus, the ALJ improperly afforded weight to Dr. Reid's opinion.

Listing 12.04(C) is met as substantial evidence in the AR establishes that (1) Hughes has a medically documented history of the existence of a series and persistent mental disorder over a period of at least 2 years; (2) she received ongoing medical treatment, mental health therapy, and a highly structured setting, which diminishes the symptoms of her mental disorder; and (3) she has marginal adjustment, which is the minimal capacity to adapt to changes in her environment or to demands that are not already part of her daily life.

### III.    Remand is Unnecessary

At step five, the "burden of production shifts to the Commissioner." Stormo, 377 F.3d at 806.  The court may affirm, modify, or reverse the Commissioner's decision, with or without remand to the Commissioner for a rehearing.  42 U.S.C. § 409(g).  If the court determines that the "record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which the plaintiff is entitled, reversal is appropriate." Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992).

At the third administrative hearing, David Perry, a vocational expert, testified.  (AR 1463-86).  Perry testified that an individual with marked restrictions in their ability to interact appropriately with supervisors and co-

56

workers would not be capable of competitive full-time employment.  Id. at pp.

1484.  Perry testified an individual with marked restrictions in her ability to

respond appropriately to usual work situations and to changes in a routine

work setting would not be able to work in a competitive environment.  Id. at pp.

1484-85.  Dr. Lord, Hughes' treating psychiatrist, opined that Hughes had

marked restrictions on her ability to understand and remember simple

instructions, understand, and remember complex instructions, make

judgments on complex work-related decisions, interact appropriately with

supervisors, interact appropriately with coworkers, and respond appropriately

to usual work situations and to changes in a routine work setting.  Id. at pp.

864-65.  As discussed earlier, this court finds Dr. Lord to be credible.  Because

Hughes has marked restrictions in her ability to interact appropriately with

supervisors and co-workers, respond appropriately to usual work situations,

and adapt to changes in a routine work setting, she would be unable to work in

a competitive environment.  Additionally, as discussed earlier, Dr. Atkin

examined Hughes' medical records and opined that she met Social Security

listing 12.04(C); therefore, she was presumptively entitled to disability benefits.

Id. at pp. 36-61.

Remand to the Commissioner is neither necessary nor appropriate in this

case.  Hughes is disabled and entitled to benefits.  Reversal is the remedy at

this juncture.  See Cumella v. Colvin, 936 F.Supp 1120 (D.S.D. 2013) (granting

benefits when the Claimant met and listing and the Commissioner's vocational

specialist testified that if the treating physician's limitations were applied, the claimant could not perform any job).

**ORDER**

Based on the above analysis, it is hereby

ORDERED that claimant's motion to reverse the decision of the Commissioner (Doc. 12) is granted and the Commissioner's motion to remand (Doc. 13) is denied.

IT IS FURTHER ORDERED that the decision of the Commissioner of May 25, 2021, is reversed and the case is remanded to the Commissioner for the sole purpose of calculating and awarding benefits to the plaintiff.

DATED this 26th day of September, 2023.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge